FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2019 FEB -4 PM 1: 03

CLERK _C. Robinson_
SO. DIST. OF GA.

MATTHEW SCHANTZ,

     Plaintiff,

     v.

BENNY DELOACH, former Sheriff
of Appling County, Georgia, in
his individual capacity

     Defendant.

CV 2:17-157

## ORDER

     Plaintiff Matthew Schantz alleges that Defendant Benny Deloach, the former Appling County Sheriff, used excessive force when DeLoach shot Shantz as Shantz was attempting to evade law enforcement on his motorcycle. He brings this action under 42 U.S.C. § 1983, as well as various state law claims, seeking payment for injuries he sustained during the incident. DeLoach has moved for summary judgment, alleging that the force he used was appropriate under the circumstances and, in the alternative, that he is entitled to qualified immunity. Ultimately, the question before this Court is not whether DeLoach chose the best course of action to end the chase but instead whether DeLoach's decision fell within the broad scope of behavior deemed acceptable under the Fourth Amendment. Because the Court answers this question in

the affirmative, it must grant DeLoach's Motion for Summary Judgment and dismiss Schantz's Complaint.

## BACKGROUND

On June 17, 2016, Schantz was driving his new 2004 Suzuki GSX R750 motorcycle through Appling County on his way to the beach in coastal South Georgia. Dkt. No. 1 ¶¶ 9-10; Dkt. No. 27-8 at 1. As he drove, he passed Appling County Deputy Tim Sullivan, who noticed Schantz's motorcycle was missing a vehicle registration tag. See Dkt. No. 27-8 ¶ 3. Sullivan activated his police lights to signal Schantz to stop. Id. ¶ 3; Dkt. No. 27-2 at 101. Instead, Schantz "took off," initiating a high-speed chase with the Appling County Sheriff's Department on US Highway 341. See Dkt. No. 27-2 at 94-95, 109. Shantz admits that he had smoked marijuana before leaving his home in Perry and had marijuana and a pipe in his possession as he traveled. Id. at 10-12. As Shantz recalled, he decided he would rather get to the beach than go to jail. Id. at 107. As a result, he sped away. Shantz admits that his motorcycle reached speeds in excess of 100 miles per hour. Dkt. No. 27-8 ¶ 9. At some point, Appling County Lieutenant Robert Eunice joined the pursuit and eventually became the lead pursuit vehicle. Id. ¶¶ 7-8. He observed Shantz run a red light in downtown Baxley, Georgia and continue down U.S. Highway 341. See id. ¶ 7. Eunice ultimately lost sight of Schantz, and Appling County discontinued its chase. Id. ¶ 10.

AO 72A
(Rev. 8/82)

Around this time, Captain Kenny Poppell of the Wayne County Sheriff's Office heard over the police radio that Schantz was leaving Appling County and entering Wayne County. Id. ¶¶ 11-12. After spotting Schantz's motorcycle heading Eastbound on U.S. Highway 341, Poppell sped up his vehicle to 90 miles per hour, but Shantz passed him traveling well in excess of that speed. Id. ¶¶ 12-14. In a deposition, Poppell testified that Shantz was weaving "in and out of traffic" in a "race mode stance" Dkt. No. 27-5 at 44, 46. Poppell continued to pursue Shantz for approximately thirty miles after which Shantz confronted another Wayne County officer at an intersection in Jesup, Georgia. Dkt. No. 27-8 ¶¶ 17, 17 n. 1. At that point, Shantz turned around and began traveling in the other direction while riding only on the back wheel of his motorcycle (a "wheelie"). Id. ¶ 18. Poppell testified that around this time he lost sight of Shantz, but he managed to spot him again in the town of Odom where Shantz was again traveling only on his back wheel. Dkt. No. 27-5 at 46-48; Dkt. No. 27-8 ¶ 19. Poppell also testified that as Shantz continued to flee, he came across two police units blocking the northbound lane of 341. See Dkt. No. 27-5 at 49. Poppell alleges that Shantz then swerved into oncoming traffic in the southbound lane, running other vehicles off the road. Id.

Eventually, Eunice and Defendant DeLoach learned through radio traffic that Shantz was returning to Appling County. Dkt.

No. 27-8 ¶ 22. They set up positions on the highway just over the county line. Id. ¶ 23. DeLoach then got out of his car with a shotgun, hoping that this would encourage Shantz to stop. Dkt. No. 27-8 at 26. Just as Shantz crossed DeLoach's position, DeLoach fired a shot. Id. ¶ 27.[1] Thereafter, Shantz spun his bike around and came to a stop. See Dkt. No. 27-2 at 132-33. Shantz alleges that DeLoach was, at that time, pointing the gun toward him, and Shantz raised one hand, his right hand, off the motorcycle clutch. Id. at 136. DeLoach then racked the shotgun again, and Shantz returned his hand to the clutch and "took off." See id. at 136. The parties dispute heavily the direction that Shantz was traveling when he began to ride yet again. DeLoach contends that Shantz was accelerating toward him. Dkt. No. 27-8 ¶ 28. Shantz insists that he was headed back down the highway in the opposite direction that he had come. Dkt. No. 27-2 at 113. In either event, the parties agree that as Shantz's motorcycle began to move again, DeLoach again fired his weapon, this time striking Shantz. Dkt. No. 27-8 ¶ 30. Shantz's motorcycle continued forward briefly, but eventually he fell off his bike. Dkt. No. 27-2 at 138-39. Sometime thereafter EMS arrived at the scene, and Shantz was transferred to

---

[1] DeLoach contends that he fired a "warning shot" in the air. Dkt. No. 27-8 ¶ 27. Schantz alleges that DeLoach was aiming at him because Shantz heard a "plink" that he believed was either the bullet hitting the asphalt or pieces of asphalt hitting his bike. See Dkt. No. 27-2 at 130. For purposes of summary judgment, Shantz's version is assumed to be true. Castleberry v. Camden Cty., No. CV 2:16-00128, 2018 U.S. Dist. LEXIS 169414, at *51 (S.D. Ga. Sept. 30, 2018) (finding that the court must "draw all reasonable inferences" in favor of the non-moving party on summary judgment).

the hospital. Id. at 141, 152. He was wounded but survived his injuries. Id. at 154, 164-66.

Shantz disputes some, but not all, of the testimony concerning his allegedly reckless driving during the chase. For purposes of this motion, it is important to identify the non-disputed testimony, for only such non-disputed testimony can serve as a basis for summary judgment. In an affidavit submitted in opposition to DeLoach's motion, Shantz states that while he "did ride [his] motorcycle at speeds in excess of 100 miles per hour . . . [he] did not drive recklessly, erratically, or in any way that would put other people at danger." Dkt. No. 41 ¶ 2. He characterized the chase as "a series of brief encounters where [he] tried to avoid contact with the police, which [he] accomplished in a safe manner when the opportunity presented itself by accelerating in short bursts to put them behind [him]." Id. ¶ 3. He conceded that he once drove through a red light but contends that he did so in a "safe manner" by ensuring "the road was clear before [he] went through the intersection." Id. ¶ 4. He stated that "[a]t no time did [he] run anyone off the road or otherwise threaten the safety of other motorists." Id. In short, Shantz admits evading police, driving more than 100 miles per hour, and running a red light, but he characterizes such behavior as "safe."

DeLoach submitted audio excerpts of police radio traffic from the day in question. These excerpts, taken from both Appling County

and Wayne County radio, contain references to reckless activity that officers report witnessing during the chase. For example, on Appling County radio, officers can be heard stating that Shantz was "zipping around some big trucks," dkt. no. 40, Ex. B., Track 7 at 0:09-0:12, and that his speed at one time was up to "one-thirty," dkt. no. 40, Ex. B., Track 12 at 0:08-0:09. On Wayne County radio, an officer reports that Shantz was "not slowing up for anything, in and out of traffic." Dkt. No. 40, Ex. C., 6-17-16 02.18.33PM Radio (SO) at 1:11-1:13. The same officer later noted that Shantz was "coming into some heavy traffic," id. at 1:46-1:48, and that he was "in the turn lane passing all [the] heavy traffic," id. at 2:22-2:25. A recording from a few minutes later refers to Shantz as "doing a wheelie," Dkt. No. 40, Ex. C., 6-17-16 02.21.22PM Radio (SO) at 0:13-0:15, and less than ten minutes after that an officer reported that Shantz "went into on-coming traffic around [him]," Dkt. No. 40, Ex. C., 6-17-16 02.31.26PM Radio (SO) at 1:32-1:34.

In an affidavit submitted in support of his motion, DeLoach states that he "heard of Mr. Schantz weaving in and out of traffic, running red lights, traveling on the wrong side of the road, and traveling in speeds of [sic] excess of 100 mph on the Wayne county radio traffic, which Appling County Sheriff's Department could access." Dkt. No. 39-2 ¶ 6. He also stated that, while involved in the chase, he personally saw Shantz run the red light in Baxley.

Id. ¶ 5. Shantz has not challenged the validity of any of the recordings.[2]

In December 2017, Shantz filed an action against DeLoach individually, asserting a claim under 42 U.S.C. § 1983 for violation of his Fourth Amendment rights, as well state law claims for negligence, battery, and violations of the Georgia Constitution. Dkt. No. 1. DeLoach moves for summary judgment on each of Shantz's claims.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Investor Group.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. Factual disputes that are

---

[2] In his opposition brief to DeLoach's motion, Shantz disputed DeLoach's contention that DeLoach "knew from listening to radio traffic that [Shantz] had been driving recklessly, running red lights, [and] traveling on the wrong side of the road." See Dkt. No. 27-8 ¶ 25; Dkt. No. 33-1 ¶ 25. But the only evidence Shantz submitted to challenge DeLoach on this point was recordings from what appears to be Jesup Police Department radio traffic from the day of the incident. However, Shantz relies on an incomplete submission of the radio traffic heard by DeLoach. DeLoach submitted the excerpts of radio traffic from Appling and Wayne counties described above. See Dkt. No. 40. Shantz, as mentioned, has not challenged the validity of these recordings, nor has he introduced any evidence to refute DeLoach's contention that he had access to and heard these recordings during the incident.

"irrelevant or unnecessary" are not sufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332) (Brennan J. dissenting). Alternatively, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not

AO 72A
(Rev. 8/82)

only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I.  Qualified Immunity

DeLoach contends that his use of force against Shantz was reasonable and necessary under the circumstances and therefore did not violate Shantz's rights under the Fourth Amendment. Alternatively, he argues that he is entitled to qualified immunity for his actions because there is no binding authority clearly establishing that the course of action he chose to end the chase was unlawful.

Qualified immunity grants "complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). To establish a qualified immunity defense, the defendant must first show that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Estate of Cummings v. Davenport, 906 F.3d 934, 940 (11th Cir. 2018). The burden then shifts to the plaintiff, who must show 1) that the defendant's alleged actions violated a constitutional or statutory right and 2) that such a right was "clearly established." Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003). Here, the parties do not

AO 72A
(Rev. 8/82)

dispute that DeLoach was acting within his discretionary authority when he shot Shantz. Accordingly, we consider only whether Shantz has satisfied his burden to show that DeLoach was not entitled to qualified immunity.

As a threshold matter, it is critical to determine the nature of the right that DeLoach is alleged to have infringed. Generally, courts treat the use of force in vehicle chase cases as investigatory stops or arrests, which are most properly analyzed under the Fourth Amendment's protection against unreasonable seizures of the person. See Graham v. Connor, 490 U.S. 386, 394 (1989). The standard used by courts to determine whether the use of force was excessive is "objective reasonableness." Pace v. Copobianco, 283 F.3d 1275, 1281 (11th Cir. 2002). That is, courts ask "whether a reasonable officer would believe" that the level of force used to stop the suspect was "necessary in the situation at hand." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting Willingham v. Loughnan, 261 F.3d 1178, 1186 (11th Cir. 2001)). Reasonableness is adjudged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

Assuming, without deciding, that DeLoach acted unreasonably by firing at Shantz as he tried to escape, the Court finds that Shantz has failed to establish the second prong of the qualified immunity analysis—that is, he has not shown that the

AO 72A
(Rev. 8/82)

unreasonableness of DeLoach's actions were "clearly established" at the time of the incident. A right is clearly established for purposes of the qualified immunity defense when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015). "Unless a government agent's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent officer or one who has knowingly violated the law would have done such a thing, the government actor has immunity from suit." Lassiter v. Alabama A & M Univ., Bd. Of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994).

Plaintiffs may use three methods to show that a right is "clearly established." First, they may bring forth a "materially similar case" decided prior to the officer's actions that gives notice to the officer that his actions were unlawful. Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005). Second, they can "show that a broader, clearly established principle should control the novel facts in this situation." Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Finally, they can show that the conduct is so obviously unconstitutional that no prior case law need be established. Id.

Here, Shantz seeks to show the existence of a clearly established right through one of the first two methods. First, he argues that DeLoach violated the "clearly established" principle

that "where the suspect is not a fleeing felon and poses no immediate threat to the officer or others, the use of deadly force is a violation of the suspect's Fourth Amendment rights." Dkt. No. 33 (quoting Harrell v. Decatur Country, 22 F. 3d 1570, 1573 (11th Cir. 1994)). There are two problems with this proposition. First, using only the conduct admitted by Shantz, he led officers on an extended chase down major roadways, ran a red light, did wheelies, and drove at least 100 miler per hour. Shantz was plainly a "fleeing felon" in that, at the time of the chase, he was violating O.C.G.A. § 40-6-395, which expressly states that it is a felony to flee from police while driving "in excess of 20 miles an hour above the posted speed limit"—an act that Shantz expressly admits to having done. See Dkt. No. 27-2 at 107-110 (admitting to fleeing from police); see also Dkt. No. 33-1 ¶ 9 (admitting to reaching speeds "well in excess if 100 mph").[3] Second, the undisputed evidence that DeLoach witnessed or was made aware by police radio of the dangerous actions taken by Shantz cannot be countered merely by stating that driving 100 miles per hour and running red lights is "safe."

---

[3] The Court takes judicial notice that, per Shantz's admission, he was driving more than twenty miles per hour above the posted speed limit given that the maximum speed limit in the state of Georgia is seventy miles per hour. See O.C.G.A. § 40-6-181. It may be that the speed limits in towns such as Odum, Baxley, and Jesup are less than seventy miles per hour. However, giving Shantz the benefit of the doubt, the Court will assume for purposes of this motion that all sections of the roads involved permitted the maximum possible speed allowed in Georgia: seventy miles per hour.

Moreover, the principle urged by Shantz is not the type of "clearly established" law necessary to put officers on notice that their actions were unlawful. see Mullenix, 136 S. Ct. at 308. Indeed, the Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality." Id. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. The principle that an officer cannot use force without an "immediate threat" to officers or civilians is a generalized rule that calls for a subjective inquiry into the facts and circumstances of a given situation. Indeed, the Supreme Court has stated that in the context of excessive force claims based on vehicle chases, "the result depends very much on the facts of each case." Brosseau v. Haugen, 543 U.S. 194 (2004). Because "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts," Mullenix, 136 S. Ct. at 308 (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)), the Court cannot find—absent a factually similar decision applying Shantz's proposed principle-that DeLoach was on notice that his acts were necessarily unlawful.

Alternatively, Shantz contends that specific case law constructively put DeLoach on notice that his actions violated the Constitution. However, the weight of factually similar authority tends to suggest that the opposite is true—that is, that DeLoach

acted reasonably in firing at Shantz to end the chase. In Pace v. Copobianco, the Eleventh Circuit found that police did not use excessive force when they fired on a fleeing suspect who had been cornered and effectively trapped in a cul-de-sac. 283 F.3d at 1277-78, 1282. In that case, the plaintiff's decedent had led several police cars on a high-speed pursuit during which he had swerved his car in front of or toward police cars, driven through a residential front yard, and nearly hit a motorist while driving on the wrong side of the road. Id. at 1277. After an approximately fifteen-minute chase, the driver turned into the back of a cul-de-sac and stopped his car with his engine running. Id. at 1277-78. Seconds later—at most—an officer fired shots through the windshield, at which time the vehicle again began moving forward. Id. at 1278. The court accepted as true testimony from a non-party witness that the driver was not aiming his vehicle at deputies during this time or otherwise trying to run them over. Id. at 1279. As the vehicle moved, officers fired several more shots until the car stopped in a residential backyard with the driver having died. Id. at 1278.

In reaching its conclusion that no constitutional violation occurred, the court relied heavily on the fact that the deceased had driven aggressively and "used [his] automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon." Id. at 1281-82. The Court found that

though the car was stopped when shots were fired, "no cooling time had passed" for the officers in pursuit, and, given the driver's reckless efforts to evade police, the officers simply could not be certain the chase was over. Id. at 1282. Accordingly, the court found that the Fourth Amendment had not "ruled out the use of deadly force." Id.

Several years later, the Supreme Court in Plumhoff v. Rickard found officers had not violated the Fourth Amendment by shooting a fleeing driver under a similar set of facts. 572 U.S. 765, 768 (2014). In that case, the plaintiff's decedent fled from several officers in a vehicle chase reaching speeds of over 100 miles per hour. Id. at 769. During the chase, the driver swerved through traffic and passed more than two dozen vehicles. Id. Eventually, the driver's vehicle made contact with a police cruiser, causing the driver's car to spin out and collide with another cruiser. Id. The driver then put his car into reverse in an effort to escape. Id. As he did, two officers began pounding on the passenger side window. Id. at 679-70. The car then made contact with another cruiser, and the tires continued spinning as the driver kept his foot on the accelerator. Id. at 770. An officer then fired three shots into the car, which thereafter reversed and maneuvered into another street as an officer had to side-step the car to avoid being hit. Id. As the driver fled, two officers collectively fired

twelve shots at the car, causing the driver to crash. Id. The
driver and passenger were both killed. Id.

In finding that the officers' actions did not infringe on the
driver's Fourth Amendment rights, the Court identified some of the
reckless activity from the chase, such as the speed in excess of
100 miles per hour and the passing of many vehicles, some of which
had to alter course. Id. at 776. The high Court thereafter
concluded:

> Under the circumstances at the moment when the shots
> were fired, all that a reasonable police officer could
> have concluded was that [the driver] was intent on
> resuming his flight and that, if he were allowed to do
> so, he would once again pose a deadly threat for others
> on the road.

Id. at 777. The Court found that the driver's flight "posed a grave
public safety risk, and . . . the police acted reasonably in using
deadly force to end that risk." Id.

Likewise, in Small v. Glynn County, this Court looked at
somewhat similar facts and concluded that officers were not liable
in lethally shooting a driver attempting to flee. 77 F. Supp. 3d
1271, 1278, 1280 (S.D. Ga. 2014). There, the deceased driver fled
from police after an officer approached her in a parking lot. Id.
at 1276. Though the driver blew out a tire on a curb, she continued
driving around the lot, slowly weaving between the lanes and
narrowly missing civilian motorists. Id. Eventually, the driver
entered the public roadway, once veering into oncoming traffic and

AO 72A
(Rev. 8/82)

also swerving off the road onto the adjacent grass on multiple occasions. Id. At one point after entering a neighborhood, she continuously weaved and often drove on the wrong side of the road for extended periods. Id. at 1277. She struck a mailbox, ran stop signs, and drove through a residential front yard. Id. She was alleged to have nearly made contact with officers on multiple occasions. Id.

Eventually, one of the officers executed a successful PIT (precision immobilization technique) maneuver, causing the driver's car to spin onto a lawn, with the rear bumper next to a utility pole. Id. An officer positioned his cruiser in front of her, effectively trapping her car between the cruiser and the pole. Id. After the officer exited his vehicle, the driver began maneuvering her vehicle between the police cruiser and the pole, in an attempt—at least in the officer's view—to free her vehicle. Id. at 1278. Other officers arrived on the scene around this time and eventually perceived that the driver might be able to free her car from the trap and drive into them. Id. Ultimately, the car did inch forward, at which time officers fired, killing the driver. Id.

In finding that the officer's actions were lawful, this Court emphasized the reckless behavior exhibited by the driver during the chase, such as turning in front of oncoming cars and running off the road. Id. at 1280. This Court found that "[u]nder the

circumstances, it was reasonable to perceive that [the driver] had used her car as a deadly weapon." Id. at 1281. It concluded that "[o]bjectively reasonable officers would conclude that she posed a threat to, at a minimum, the officers standing a few yards away." Id. at 1282. The decision was affirmed by the Eleventh Circuit. McGehee v. Glynn County, 598 Fed. App'x 752 (11th Cir. 2015).

Undoubtedly, the facts from these cases—and others like them— vary. However, the recurring theme in each of these cases is that a driver who uses his vehicle during a chase in such a way that significantly endangers others effectively converts his vehicle into a deadly weapon. Officers in those cases were justified in using deadly force because they reasonably believed that the fleeing suspect would, if allowed to continue, use that "deadly weapon" again in a way that could harm themselves or others. Pace, 283 F.3d at 1282 (finding that the driver "had used the automobile in a manner to give reasonable policeman probable cause to believe that it had become a deadly weapon with which [he] was armed"); Plumoff, 572 U.S. at 777 (finding that if the driver were allowed to continue, "he would once again pose a deadly threat for others on the road"); Small, 77 F. Supp. at 1281 ("Under the circumstances, it was reasonable to perceive that [the driver] had used her car as a deadly weapon."). The facts of this case are not materially distinguishable. Like the drivers in Pace, Plumoff, and Small, Shantz is alleged to have driven recklessly in such a way

that endangered others around him. Indeed, DeLoach heard police on the official police radio report that Shantz drove in excess of 100 miles per hour, rode in a "race stance mode", ran a red light, rode only on his back wheel at least twice, and drove on the wrong side of the road on multiple occasions, sometimes driving other cars off the road. See Dkt. No. 27 ¶¶ 7, 9, 15-16, 18-20. DeLoach himself witnessed some of the reckless behavior.

Moreover, Shantz admits much of this conduct, including driving more than 100 miles per hour and running a red light in an attempt to evade police. No factual dispute is created by his subjective characterization of such conduct as driving in a "safe manner" and not "in any way that would put other people at danger." Dkt. No. 41 ¶¶ 2-4. Moreover, even if we assume that Shantz's subjective characterization of driving 100 miles per hour and running a red light is true, those facts do not necessarily inculpate DeLoach. To be sure, DeLoach, who is sued here in his individual capacity, states in his uncontested affidavit that he heard over police radio that Shantz was driving in a reckless manner. Radio recordings from that day refer to a range of dangerous activity, such as driving up to 130 miles per hour, dkt. no. 40, Ex. B., Track 12 at 0:08-0:09, riding "in and out of traffic," dkt. no. 40, Ex. C., 6-17-16 02.18.33PM Radio (SO) at 1:11-1:13, and "doing a wheelie," dkt. no. 40, Ex. C., 6-17-16 02.21.22PM Radio (SO) at 0:13-0:15. Thus, irrespective of whether

AO 72A
(Rev. 8/82)

Shantz considers himself such a special driver that he can do such things safely, DeLoach reasonably *perceived* Shantz to have driven in such a way that put others in danger at the time Shantz sought to flee from DeLoach's presence.[4] DeLoach had no way of knowing that Shantz was so special that he can "safely" drive at least 30 miles over the speed limit, run red lights, and flee from police through multiple counties. That is, an officer hearing of such behavior would have arguable probable cause to believe that deadly force was justified. Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). It is DeLoach's perception, rather than Shantz's characterization, that ultimately governs whether DeLoach acted reasonably in choosing to fire his weapon. See Taffe v. Wengert, 775 Fed. App'x 459, 466 (11th Cir. 2019) ("Officers may use deadly force against individuals they *reasonably perceive* pose an imminent threat of serious physical harm to the officers or others") (emphasis added); Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005)("[R]easonableness is determined based on the information possessed by the officer at the moment that force is employed.").

Nor are the decisions above distinguishable because, as Shantz suggests, the drivers in those cases posed a more direct

---

[4] This is particularly true where, as here, DeLoach witnessed some of Shantz's reckless behavior firsthand.

AO 72A
(Rev. 8/82)

and immediate threat to officer safety. Albeit, the facts in Plumoff and Small were such that officers perceived they were about to be run over at the time they fired their weapons. In contrast, Shantz alleges here that he was driving away from DeLoach at the time he was shot. But this distinction does not render DeLoach's actions in this case unreasonable. First, Plumoff and Small did not rely solely on the immediate personal threat to the officers at the scene in determining that deadly force was reasonable. In both cases, the courts also considered the more generalized danger that the drivers' reckless acts had posed and would continue to pose if the chase continued. See Plumhoff, 572 U.S. at 777 ("Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the driver] was intent on resuming his flight and that, if he were allowed to do so, he would once again pose a deadly threat for others on the road."); see Small, 77 F. Supp. 3d 1271, 1281 (relying, in part, on the fact that the driver had driven recklessly and "used her car as a deadly weapon" in concluding that the police had acted reasonably by using deadly force).

Second, the Pace decision makes clear that the theoretical risk posed to future victims—rather than merely the pending risk to individuals at the immediate scene—can be sufficient to justify deadly force. There, the first shots were fired when the vehicle was stopped and effectively blocked from entering back on the

AO 72A
(Rev. 8/82)

roadway. Pace, 283 F.3d at 1277-78. Moreover, while the car began to move again as the officers fired (possibly because the driver had already died and released his foot from the brake), the Court accepted as true that the driver was not aiming at officers or otherwise attempting to hit them with his car. Id. at 1278-79. The court found that the officers reasonably could have believed that the chase was not over, and that the driver had "used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which Davis was armed." Id. at 1282. Plumhoff, Pace, and Small serve to support the constitutionality of DeLoach's conduct rather than put him on notice that his actions were clearly unconstitutional.

In an effort to point to case law putting DeLoach on notice that his actions were unreasonable, Shantz cites to Vaughan v. Cox. There, the Eleventh Circuit held that an officer violated the plaintiff passenger's Fourth Amendment rights when the officer inadvertently shot the plaintiff after firing at a moving vehicle in an effort to stop a chase. 343 F.3d 1323, 1329-30 (11th Cir. 2003). In that case, officers began pursuing a truck that matched the description of a vehicle that had just been stolen from a service station. Id. at 1325-26. The defendant officer positioned his cruiser in front of the truck and applied his brakes, at which point the truck collided into the back of the cruiser. Id. at 1326. Thereafter, another officer traveling in the rear activated his

AO 72A
(Rev. 8/82)

lights, and the fleeing driver accelerated to eighty-five miles per hour in a seventy miles-per-hour zone. Id. at 1327. The defendant, now traveling in another lane beside the fleeing suspects, fired three shots into the truck, one of which hit the plaintiff. Id. The driver reacted by making a "desperate break for freedom," driving recklessly until he eventually lost control and collided into a median. Id.

Vaughan is distinguishable in that the court's conclusion with respect to the Fourth Amendment question rested heavily on the finding that there were "[g]enuine issues of material fact" as to whether the chase "presented an immediate threat of serious harm to [the officer] or others at the time [the officer] fired the shot that struck Vaughan." Id. at 1330. That was because under the plaintiff's version of the facts, there was no evidence "that the suspects had menaced or were likely to menace others on the highway at the time of the shooting." Id. Instead, the fleeing vehicle's lane "was clear of traffic and [the driver] made no aggressive moves to change lanes before [the officer] fired." Id. Moreover, the court noted that, according to the plaintiff, "the collision between the truck and [the officer's] cruiser was both accidental and insufficient to cause [the officer] to lose control." Id. In contrast, Shantz in this case does not dispute many of the facts that arguably justified DeLoach's use of force, such as his extraordinarily high rate of speed, his having run a

red light, and his doing wheelies during the pursuit. While he does dispute certain facts about his reckless behavior, such as his having swerved into oncoming traffic, he cannot dispute that the police radio described such behavior. Such reports reasonably led DeLoach to believe—and thereby created arguable probable cause to believe—that Shantz was placing others in immediate danger.

Furthermore, even to the extent that there are parallels between Shantz's chase and the Plaintiff's version of facts in Vaughan, the inquiry with respect to qualified immunity is whether precedent at the time of the incident "placed the statutory or constitutional question beyond debate". Mullenix, 136 S. Ct. at 259 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). In Pace, Plumhoff, and Small, the facts more closely resemble the present case in that the suspects drove recklessly and placed others in significant danger before the shooting took place. Undoubtedly, Vaughan offers an example of a scenario where a court found the force used could be excessive. However, the reckless dangerous conduct was disputed in Vaughan. Under the Vaughan plaintiff's version of facts, the officers "simply faced two suspects who were evading arrest and who had accelerated to eighty to eighty-five miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture." Vaughan, 343 F.3d at 1330. As the Supreme Court has stated, "qualified immunity protects actions in the 'hazy border between excessive and acceptable force.'"

AO 72A
(Rev. 8/82)

Mullenix, 136 S. Ct. at 312 (quoting Brossesau v. Haugen, 543 U.S. 194, 201 (2004)).

This Court simply cannot find, in light of the universe of case law existing at the time of the incident, that DeLoach was on notice that it was unlawful to fire at Shantz as he took up yet another effort to evade arrest. To the contrary, the authoritative cases that present facts most similar to the present case tend to suggest that DeLoach's actions were lawful.

## II.    State Law Claims

As a final matter, Shantz has also brought state claims for negligence, battery, and violations of the Georgia Constitution. Because this Court finds that Shantz's only claims that invoke federal jurisdiction should be dismissed, it declines to exercise pendent jurisdiction over the remaining state claims. See Hardy v. Birmingham Bd. of Educ., 954 F.2d 1546, 1550 (11th Cir. 1992) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (emphasis omitted) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)); see also Wilder v. Irvin, 423 F. Supp. 639, 643 (finding pendent jurisdiction was not appropriate where there was not considerable overlap between the state and federal claims and where the state claim "would inject new issues and a large amount of facts unrelated to the

other portion of the case involving the federal claim"). Accordingly, these claims will also be dismissed.

## CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment, dkt. no. 27, with respect to Plaintiff's § 1983 claim, Count I of the Complaint, is **GRANTED**. Defendant's Motion with respect to Plaintiff's state law claims is **DENIED as moot**. Counts II and III of the Complaint are **DISMISSED without prejudice**. Defendant's motion to exclude testimony, dkt. no. 26, is **DENIED as moot**. The Clerk of Court is **DIRECTED** to **close this case.**

**SO ORDERED**, this 4th day of February, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)